IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| FIELDWISE LLC, | ) | CASE NO. 2:19-CV-80 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TEGRA LLC and ANCHOR EXPRESS INC., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**COMPLAINT FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY AND PERMANENT INJUNCTIONS, AND REPLEVIN**

Plaintiff FieldWise LLC, by counsel, for its Complaint for Temporary Restraining Order, Preliminary and Permanent Injunctions, and Replevin against Defendants Tegra LLC and Anchor Express Inc. (together, the "Defendants"), alleges and states as follows:

**PARTIES, JURISDICTION, AND VENUE**

1. FieldWise is a Texas limited liability company, with principal places of business in Magnolia, Texas and Ewing, Nebraska.

2. The sole member of FieldWise is Brian P. Klawinski, who is a citizen of Texas.

3. For purposes of diversity jurisdiction, FieldWise is a citizen of Texas and Nebraska.

4. Tegra is an Indiana limited liability company, with its principal place of business in Remington, Indiana.

5. Upon information and belief, the sole member of Tegra is Lance Schwab, who is a citizen of Indiana.

6. For purposes of diversity jurisdiction, Tegra is a citizen of Indiana.

7. Anchor is an Illinois corporation, with its principal place of business in Bensenville, Illinois.

8. Anchor does business in, among other states, Indiana, and has availed itself of this Court's jurisdiction by contracting with entities, including Tegra, located within this District and Division.

9. FieldWise brings this action to enjoin Tegra from using or disclosing FieldWise's confidential and proprietary business and technological information and trade secrets, and to compel Anchor to return confidential and proprietary equipment taken from FieldWise.

10. If Tegra is not enjoined from disclosing and Anchor not compelled to return FieldWise's property, FieldWise will suffer substantial losses that will be difficult or impossible to fully calculate and be placed at a competitive disadvantage. The losses far FieldWise exceed $75,000, exclusive of interest and costs.

11. Because this action is between citizens of different states, and the amount in controversy exceeds $75,000, exclusive of interest and costs, this Court has jurisdiction over the subject matter of the entire case. *See* 28 U.S.C. § 1332; *Strawbridge v. Curtiss*, 7 U.S. 267 (1806).

12. Count V of this Complaint arises under the laws of the United States, namely the Defend Trade Secrets Act, 18 U.S.C. §§ 1831–39. Accordingly, this Court has original jurisdiction over all claims pursuant to 28 U.S.C. § 1331. *See also* 28 U.S.C. § 1367.

13. Venue is proper in this Court because a substantial part of the events giving rise to the claims asserted in this Complaint occurred in Jasper County, Indiana. *See* 28 U.S.C. § 1391(b)(2).

14. Venue is also proper in this Court because Tegra is located in Jasper County, Indiana. *See* 28 U.S.C. § 1391(b).

15. Jasper County is located within the Hammond Division of the judicial district for the Northern District of Indiana. *See* 28 U.S.C. § 94(a)(3).

**FACTUAL BACKGROUND**

*FieldWise Z5 Universal Control Panel*

16. FieldWise develops and markets agricultural equipment, including irrigation equipment with advanced, cutting-edge technology that is not otherwise in the market. (Affidavit of Brian Klawinski, Ex. 1, ¶ 4.)

17. Recently, FieldWise developed and began marketing the FieldWise Z5 Universal Computer Panel – 5" LCD Computerized Irrigation Controller (the "Z5"), an advanced irrigation control device used for farming. (*Id.* at ¶ 5.)

18. FieldWise spent roughly three years and $3,000,000.00 developing the Z5. (*Id.* at ¶ 6.)

19. FieldWise sells Z5 devices subject to five-year minimum licensing agreements. (*Id.* at ¶ 7.)

20. There is a patent pending for the Z5. (*Id.* at ¶ 8.)

*Wrongful Possession of the Equipment by FieldWise Distributor*

21. Irrigation Components International (V.I.), Inc. ("ICII"), a non-party, is a distributor of FieldWise products. (*Id.* at ¶ 9; *see id.* at Ex. A.)

22. As part of ICII's distributorship relationship with FieldWise, ICII employees are provided limited access to FieldWise information through a distributor computed system, which includes log in credentials. (*Id.* at ¶ 10.)

23. On occasion, with FieldWise's direction and with its consent, ICII displays and demonstrates FieldWise products at certain trade shows. (*Id.* at ¶ 11.)

24. From December 3 to 7, 2018, ICII displayed and demonstrated a Z5 device, serial number Z500002472 and a FieldWise Smart Radio LTE-M1, serial number STM1001425

(together, the "Equipment"), at the Irrigation Association's 2018 Irrigation Show & Education Conference in Long Beach, California (the "IA Conference"). (*Id.* at ¶ 12.)

25. The Equipment was installed on an ICII Hydrus 2300V Panel (the "Panel") for display and demonstration purposes at the IA Conference. (*Id.* at ¶ 13.)

26. ICII was required to promptly return the Equipment to FieldWise after the IA Conference. (*Id.* at ¶ 14.)

27. At no point did FieldWise authorize ICII to keep or transfer the Equipment. (*Id.* at ¶ 15.)

28. On December 12, 2018, Ted Santiesteban, on behalf of ICII, and Jared Kruntorad, on behalf of FieldWise, exchanged emails regarding the return of the Equipment to FieldWise after the IA Conference (the "December 12, 2018 Emails"). (*Id.* at ¶ 16; *see id.* at Ex. B.)

29. In the December 12, 2018 Emails, ICII requested FieldWise's permission to keep the Equipment for testing and design purposes. (*Id.* at ¶ 17.)

30. FieldWise responded and stated that ICII could keep the Panel but did not give ICII permission to keep the Equipment. (*Id.* at ¶ 18.)

31. FieldWise twice in the December 12, 2018 Emails asked ICII for updates regarding the return of the Equipment to FieldWise, and it offered to provide ICII with shipping labels to facilitate the return of the Equipment to FieldWise. (*Id.* at ¶ 19.)

### *ICII's Unauthorized Transfer of the Equipment to Tegra*

32. Tegra is a customer of ICII. (*Id.* at ¶ 20.)

33. In or about October 2018, Tegra and ICII began discussing Tegra's purchase of FieldWise equipment from ICII. (*Id.* at ¶ 21; *see id.* at Exs. C–D.)

34. Such a sale would never have been permitted by FieldWise. (*Id.* at ¶ 22.)

35. In or about December 2018, ICII shipped the Equipment to Tegra in Indiana without FieldWise's consent or authorization. (*Id.* at ¶ 23.)

36. At no time leading up the shipment of the Equipment from ICII to Tegra did ICII notify FieldWise of its discussions with Tegra or its intent to ship the Equipment to Tegra. (*Id.* at ¶ 24.)

37. The Equipment was delivered to Tegra in Indiana on or about December 21, 2018. (*Id.* at ¶ 25.)

38. Neither ICII nor Tegra informed FieldWise that the Equipment had been delivered to Tegra. (*Id.* at ¶ 26.)

39. On January 7, 2019, Dave Taylor of FieldWise again contacted Ted Santiesteban of ICII regarding the return of the Equipment to FieldWise. (*Id.* at ¶ 27.)

40. On January 8, 2019, ICII informed FieldWise that the Equipment had been delivered to Tegra in Indiana. (*Id.* at ¶ 28.)

41. In the January 8, 2019 email, ICII stated that it had contacted a representative of Tegra and began a process of returning the Equipment to FieldWise. (*Id.* at ¶ 29; *see id.* at Ex. E.)

42. FieldWise subsequently contacted Lance Schwab, the principal of Tegra, about Tegra's communications with ICII about the Equipment and requesting transportation and shipping information for the Equipment. (*Id.* at ¶ 30.)

### *Tegra's Unauthorized Transfer of the Equipment to Ukraine*

43. Tegra distributes products to customers, including customers in Ukraine. (*Id.* at ¶ 31.)

44. On or about January 15, 2019, Tegra engaged Anchor to ship products, including the Equipment, to one of Tegra's subsidiaries, Imperial Agro, in Kherson, Ukraine. (*Id.* at ¶ 32.)

45. At no point did Tegra have FieldWise's consent or authorization to ship the Equipment outside the United States. (*Id.* at ¶ 33.)

46. To the contrary, Tegra received prior communications from ICII stating that the Equipment needed to be returned to FieldWise immediately. (*Id.* at ¶ 34.)

47. The Equipment was placed into a Maersk ocean shipping container MSKU4774016 (the "Shipping Container") for transportation to Ukraine, pursuant to the shipping order from Tegra. (*Id.* at ¶ 35.)

48. Upon information and belief, the Shipping Container is under the control of Anchor. (*Id.* at ¶ 36.)

49. According to a February 19, 2019 email from Anchor, the Shipping Container arrived at a discharge port in Gdansk, Poland on February 18, 2019. (*Id.* at ¶ 37.)

50. According to a February 19, 2019 email from Anchor, the Shipping Container has already been offloaded from the ocean vessel that carried it to Poland and, as of February 19, 2019, is being held by Polish Customs for inspection. (*Id.* at ¶ 38.)

51. Upon information and belief, once cleared by Polish Customers, the Equipment will be transported from Gdansk, Poland to Kherson, Ukraine by truck, carried by Romex Transport, Inc. (*Id.* at ¶ 39.)

52. Upon information and belief, as of the filing of this Complaint, the Equipment remains in Gdnask, Poland in the Shipping Container. (*Id.* at ¶ 40.)

53. Upon information and belief, it is expected to be moved shortly, perhaps in the next day or two. (*Id.* at ¶ 41.)

*FieldWise's Demand for Return of the Equipment*

54. On February 13, 2019, Justin Heilig, outside counsel for FieldWise, sent a demand letter to ICII and Tegra (the "February 13 Demand Letter") again demanding the return of the Equipment, and demanding that ICII and Tegra provide documents and information related to the prior shipping and transfer of the Equipment. (*Id.* at ¶ 42.)

55. The February 13 Demand Letter also demanding that ICII and Tegra refrain from having the Shipping Container unsealed, opened, or removed from the port in Gdansk, Poland. (*Id.* at ¶¶ 42–43; *see id.* at Ex. F.)

56. On February 15, 2019, FieldWise received a response to its February 13 Demand Letter from counsel for an entity which is a substantial asset owner of ICII (the "February 15 Response"). (*Id.* at ¶ 44., *see id.* at Ex. G.)

57. Such counsel stated that the February 15 Response enclosed all available documents and information responsive to FieldWise's February 13 Demand Letter. (*Id.* at ¶ 45.)

58. He also stated that ICII "did not intend to prevent FieldWise, or any agent acting on its behalf, from retrieving the Z5 Unit in a matter that is satisfactory to FieldWise." (*Id.* at ¶ 46.)

59. The February 15 Response did not represent that ICII or any defendant would take affirmative steps to return the wrongfully taken Equipment. (*Id.* at ¶ 47.)

60. Tegra did not respond to FieldWise's February 13 Demand Letter. (*Id.* at ¶ 48.)

61. On February 18, 2019, FieldWise contacted Anchor for information regarding the location and shipping status of the Shipping Container. (*Id.* at ¶ 49.)

62. FieldWise and Anchor exchanged communications regarding the Shipping Container between February 18 and 20, 2019. (*Id.* at ¶ 50; *see id.* at Exs. H–I.)

63. On February 20, 2019, FieldWise asked if Anchor could facilitate the removal of the Equipment from the Shipping Container and have it returned to FieldWise in the United States. (*Id.* at ¶ 51.)

64. Anchor responded in the affirmative and copied representatives of Romex requesting Romex's assistance in complying with FieldWise's request. (*Id.* at ¶ 52.)

65. On February 22, 2019, outside counsel for FieldWise contacted Anchor enclosing instructions to hold the Shipping Container and cease efforts transporting the Equipment to Ukraine. (*Id.* at ¶ 53.)

66. That same day, Anchor responded to counsel for FieldWise stating that it would communicate only with its client, Tegra, regarding the Shipping Container, and that Anchor would cease communications with FieldWise and would not comply with any requests from FieldWise. (*Id.* at ¶ 54.)

67. Anchor has also instructed Romex to cease communications with FieldWise. (*Id.* at ¶ 55.)

## COUNT I:  INJUNCTIVE RELIEF

68. The allegations set forth above are incorporated and realleged herein.

69. Anchor currently possesses the Equipment, constituting confidential information belonging to FieldWise.

70. All Defendants currently possess confidential documents or information relating to the Equipment belonging to FieldWise.

71. It is undisputed that the information and documents, including the Equipment, Defendants took from FieldWise are the exclusive property of FieldWise or its affiliated companies. Accordingly, FieldWise has a likelihood of prevailing on its claims for relief.

72. Anchor's continuing possession of confidential information and documents at Tegra's instruction, and Defendants improper disclosure of that information and those documents to third party competitors in foreign nations, will inflict irreparable harm on FieldWise for which there is no adequate remedy at law.  (*Id.* at ¶ 56.)

73. If any Defendants reveal confidential information and documents or provide the Equipment to third party competitors in foreign nations, it will gain an unfair competitive advantage over FieldWise.  (*Id.* at ¶ 57.)

### COUNT II:  REPLEVIN

74. The allegations set forth above are incorporated and realleged herein.

75. FieldWise has sole title and right to possess the Equipment.  (*Id.* at ¶ 58.)

76. ICII transported the Equipment to Tegra without FieldWise's consent or authorization, and it was in lawful possession of the Equipment at the time it transferred the equipment to Tegra.

77. Tegra obtained no title in or right to possess the Equipment from ICII.

78. Tegra was therefore not in lawful possession of the Equipment at the time it acquired and at the time it transferred the Equipment.

79. Anchor obtained no title in or right to possess the Equipment from ICII or Tegra.

80. Tegra wrongfully held possession of FieldWise's property.

81. Anchor wrongfully holds possession of FieldWise's property.

82. Anchor's refusal to return the Equipment to FieldWise constitutes the unlawful detention of FieldWise's property.

83. Defendants' unauthorized taking of FieldWise's confidential information and documents, including the Equipment, constitutes unlawful detention of personal property.

84. FieldWise is being irreparably harmed by Anchor's refusal to return the Equipment because FieldWise is unable to access, use, or take account of proprietary data contained on the Equipment, and because FieldWise is unable to prevent the unauthorized sale, inspection of, or use of the Equipment by third-party competitors in foreign nations. (*Id.* at ¶ 59.)

85. Moreover, because Anchor refuses to communicate with FieldWise, and has prohibited Romex from communicating with FieldWise, FieldWise has no way of determining the present location of the Equipment or tracking its future location and has no way of determining where or to whom the Equipment may be transferred after arriving in Ukraine. (*Id.* at ¶ 60.)

86. As such, the immediate return of the Equipment to the United States is imperative. (*Id.* at ¶ 61.)

### COUNT III: CLAIM FOR IMMEDIATE POSSESSION

87. The allegations set forth above are incorporated and realleged herein.

88. In support of its claim for immediate possession of the Equipment pursuant to Indiana Code § 32-35-2-2, FieldWise submits the Affidavit of Brian Klawinski attached hereto as **Exhibit 1**, pursuant to Indiana Code § 32-35-2-3. (*Id.* at ¶¶ 74–92.)

89. FieldWise holds the sole title and rights to possess the Equipment. (*Id.* at ¶ 58.)

90. FieldWise demanded that Tegra and Anchor return the Equipment, but neither of the Defendants has complied with FieldWise's request, despite acknowledgement that the Equipment is FieldWise's property.

91. Tegra has exerted unauthorized control over the Equipment, and Anchor is currently exerting unauthorized control over the Equipment.

92. Tegra and Anchor obtained the Equipment by committing criminal conversion.

93. The Equipment is intended for use in, and is used in, interstate commerce. (*Id.* at ¶ 74.)

94. Tegra is not an approved reseller. (*Id.* at ¶ 75.)

95. The estimated value of the physical Equipment is $2,550.00. (*Id.* at ¶ 76.)

96. The estimated value of the proprietary information contained in the Equipment is at least $3,000,000.00, likely considerably more. (*Id.* at ¶ 77.)

97. FieldWise is lawfully entitled to the possession of the Equipment. (*Id.* at ¶ 78.)

98. The Equipment was not taken for tax, assessment, or fine under any statute. (*Id.* at ¶ 79.)

99. The Equipment was not seized under an execution or attachment against the Equipment. (*Id.* at ¶ 80.)

100. The Equipment was improperly removed from the IA Conference in violation of FieldWise's property rights, and the Equipment was unlawfully detained. (*Id.* at ¶ 81.)

101. The Equipment was then shipped to Tegra, purportedly by accident. (*Id.* at ¶ 82.)

102. FieldWise did not give Tegra title to the Equipment, nor did it give Tegra the right to possess or transfer the Equipment. (*Id.* at ¶ 83.)

103. FieldWise instructed Tegra to return the Equipment, which Tegra did not do. (*Id.* at ¶ 84.)

104. The Equipment was wrongfully transferred to Tegra in violation of FieldWise's property rights, and it was and is unlawfully detained by Tegra. (*Id.* at ¶ 85.)

105. FieldWise did not give Anchor Express, Inc. title to the Equipment, nor did it give Tegra the right to possess or transfer the Equipment. (*Id.* at ¶ 86.)

106. FieldWise instructed Anchor Express to return the Equipment, which Anchor Express did not do.  (*Id.* at ¶ 87.)

107. The Equipment was wrongfully taken by Anchor Express from Tegra in violation of FieldWise's property rights, and it is being unlawfully detained by Anchor Express.  (*Id.* at ¶ 88.)

108. The Equipment is believed be detained in Gdansk, Poland.  (*Id.* at ¶ 89.)

109. The Equipment is currently in transit to Ukraine.  (*Id.* at ¶ 90.)

110. The Equipment has already been wrongfully removed from Indiana, and it is in immediate danger of being transported from Poland to Ukraine, possibly to a locale where it could be "knocked off" or reverse engineered, depriving FieldWise of its intellectual property rights over the technology within the Equipment.  (*Id.* at ¶ 91.)

111. The Equipment is also in immediate danger of being sold to an innocent client of Tegra in Ukraine.  (*Id.* at ¶ 92.)

### COUNT IV:  MISAPPROPRIATION OF TRADE SECRETS

112. The allegations set forth above are incorporated and realleged herein.

113. The information contained in, and incorporated as a part of, the Equipment, constitutes trade secrets.  (*Id.* at ¶ 64.)

114. Specifically, the information includes technical and engineering information, including patterns, plans, designs, processes, programs, and codes that FieldWise has taken reasonable measures to keep secret, and that derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.  (*Id.* at ¶ 65.)

115. FieldWise and its affiliated companies invested substantial resources into developing technical and proprietary information, including, design concepts, design analyses, product specifications, algorithms, and electrical designs. (*Id.* at ¶ 66.)

116. The trade secrets to which ICII and Tegra had access by virtue of their wrongful possession of the Equipment derive independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from the disclosure or use of the trade secrets. (*Id.* at ¶ 67.)

117. The trade secrets have substantial economic value to FieldWise because they are vital for FieldWise to preserve its present and future competitive advantage over competitors. (*Id.* at ¶ 68.)

118. A competitor, either in the United States or in a foreign nation, who had access to the trade secrets would gain an unfair competitive advantage. (*Id.* at ¶ 69.)

119. FieldWise goes to great lengths to protect the integrity of its data, specifically its trade secrets, by creating and disseminating policies with the license of each Z5 unit. (*Id.* at ¶ 70.)

120. FieldWise's reasonable steps taken to protect its trade secrets include: filing patents; restricting of distributors to only FieldWise-approved resellers; restricting of distribution of Z5 Units to only customers who sign licensing agreements; and including provisions in each licensing agreement prohibiting certain uses and access, or attempts to use or access the product, to prevent reverse engineering. (*Id.* at ¶ 71; *see id.* at Ex. J.)

121. FieldWise's also stores trade secret information on password-protected servers, limits access to the information and documents to those employees and distributors who needed access to perform their job functions, marks documents as confidential, and requires employees and suppliers to enter into confidentiality agreements. (*Id.* at ¶ 72.)

122. Further, FieldWise posts on the "FAQS" page of its public website that it only distributes Z5 Units subject to licensing agreements to protect its interests in its trade secrets. "[FieldWise's] products include proprietary software code, and [it is] required to license [its] products in order to legally protect them and [its] users." (*Id.* at ¶ 73; *see id.* at Ex. I.)

123. By downloading confidential information and documents, or obtaining confidential information through possession, use, and testing of the Equipment, Tegra acquired trade secrets of another by improper means.

### COUNT V: VIOLATION OF THE DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836

124. The allegations set forth above are incorporated and realleged herein.

125. The Equipment is intended for use in, and is used in, interstate commerce.

126. Defendants threaten to disclose FieldWise's trade secrets to a competitor in Ukraine without FieldWise's express or implied consent, and indeed, contrary to FieldWise's demands for the return of the Equipment.

127. ICII is not an approved reseller and had not been sold the Equipment. ICII therefore had no right to distribute the product, and FieldWise had previously informed ICII of this restriction. (*Id.* at Ex. A.)

128. Tegra is similarly not an approved reseller.

129. Defendants threaten to misappropriate FieldWise's trade secrets.

130. Anchor knows that the trade secrets were derived from Tegra, who used improper means to acquire the trade secrets.

131. Tegra made misrepresentations to FieldWise regarding the return of the Equipment and committed theft of the Equipment as defined by Indiana Code § 35-43-4-2.

132. An injunction is appropriate under 18 U.S.C. § 1836(3)(A)(i) to prevent the misappropriation of FieldWise's trade secrets, and to require affirmative actions to be taken to protect FieldWise's trade secrets.

**COUNT V: VIOLATION OF THE INDIANA UNIFORM TRADE SECRETS ACT, IND. CODE § 24-2-3-3**

133. The allegations set forth above are incorporated and realleged herein.

134. Defendants threaten to misappropriate FieldWise's trade secrets.

135. An injunction is appropriate under Indiana Code § 24-2-3-3 to prevent the misappropriation of FieldWise's trade secrets.

WHEREFORE, FieldWise requests that the Court enter judgment in favor of FieldWise and against Anchor, and enter a temporary restraining order and preliminary and permanent injunctions:

(a) Requiring Anchor to hold Container No. MSKU4774016 in a bonded warehouse at Gdansk, Poland;

(b) Requiring Anchor to cease any efforts to arrange the inland transportation of the container to Ukraine until the issue of title of the Equipment is resolved and arrangement have been made to return the Equipment to FieldWise in the United States;

(c) Requiring Anchor to produce copies of:

(i) All bills of lading or waybills issued by any type of carrier (whether ocean, rail, or motor), including but not limited to all house, master, and multimodal bills of lading, for the transport of Container No. MSKU4774016;

   (ii)  all commercial documentation including, but not limited to, any commercial invoice(s), dock and warehouse receipt(s), shipper's letter(s) of instruction, certificate(s) of origin, delivery instruction(s), and deliver order(s) issued in connection with the import/export of the Equipment;

   (iii)  all email communications between Tegra and Anchor regarding Container No. MSKU4774016 and/or the Equipment; and

   (iv)  all survey or inspection reports issued in connection with the contents of Container No. MSKU4774016, including but not limited to any reports issued by SGS Surveyors to Romex Cargo Service or any reports issued by German or Polish Customs;

(d) Requiring each Defendant to return all information and documents belonging to FieldWise that it currently possesses;

(e) Prohibiting each Defendant from:

   (i)  using information and documents that belong to FieldWise;

   (ii)  modifying, deleting, or in any way tampering with information and documents that belong to FieldWise;

   (iii)  disclosing to any third-party information and documents that belong to FieldWise; and

   (iv)  transmitting or taking copies of information and documents that belong to FieldWise out of the United States; and

(f) Prohibiting each Defendant from:

(i) using information and documents containing confidential information about the Equipment;

(ii) modifying, deleting, or in any way tampering with information and documents containing confidential information about the Equipment;

(iii) disclosing to any third-party information and documents containing confidential information about the Equipment; and

(iv) transmitting or taking copies of information and documents containing confidential information about the Equipment out of the United States; and

FieldWise further requests that it be awarded costs of this action, its reasonable attorneys' fees, and all other proper relief.

FROST BROWN TODD LLC

By: */s/Bryan S. Strawbridge*
Bryan S. Strawbridge, #29076-49
Carly J. Tebelman, # 34796-49
201 N. Illinois St., Suite 1900
P.O. Box 44961
Indianapolis, IN  46244-0961
317-237-3800
Fax: 317-237-3900
bstrawbridge@fbtlaw.com
ctebelman@fbtlaw.com

*Attorneys for FieldWise LLC*

0141543.0717743   4821-6192-1929v5