# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

FIELDWISE LLC,                      )
          Plaintiff,           )
                          )
     v.                      )     CAUSE NO.: 2:19-CV-80-JVB-JPK
                          )
TEGRA, LLC and ANCHOR EXPRESS INC.,  )
          Defendants.       )

## OPINION AND ORDER

This matter is before the Court on a motion to dismiss [DE 53] filed by Defendant Anchor Express Inc. ("Anchor"), Anchor's related motion for attorney fees [DE 57], a motion for sanctions against the defendants [DE 59] by Plaintiff FieldWise, Inc. ("FieldWise"), and Anchor's motion for leave to file a sur-reply to the motion for sanctions [DE 74]. For the reasons described below, the sur-reply is permitted, Anchor's motion to dismiss and FieldWise's motion for sanctions are granted in part, and Anchor's motion for attorney fees is denied.

## BACKGROUND

### A.  The Complaint

In brief, FieldWise's complaint alleges as follows: FieldWise is a company that develops and markets agricultural equipment. Fieldwise recently developed its Z5 Universal Computer Panel ("Z5"), a computerized irrigation control device, for use in farming. A patent is pending for the device. FieldWise permitted one of its distributors, Irrigation Components International, Inc. ("ICII"), to display and demonstrate the Z5 at a trade show in Long Beach, California, in December 2018. FieldWise told ICII to return the equipment promptly after the conference. Unbeknownst to FieldWise, ICII was negotiating with another company, Defendant Tegra LLC ("Tegra"), to sell the Z5 to Tegra, which FieldWise would not have allowed.

After the conference, ICII contacted FieldWise to ask if they could keep the equipment for testing and design purposes. FieldWise refused. Despite this, ICII did not return the Z5, and sent it to Tegra instead. Tegra received the equipment on December 21, 2018. On January 15, 2019, Tegra engaged a shipping company, Defendant Anchor, to ship the Z5 and other products to one of Tegra's subsidiaries in Europe. Although FieldWise ordered ICII and Tegra to return the equipment, it was shipped to Europe by boat.

On February 19, 2019, the shipment arrived in Gdansk, Poland, where it would be examined by customs authorities in Poland and then driven to Ukraine. FieldWise exchanged e-mails with Anchor demanding that it stop the delivery to Ukraine. After initially indicating it would cooperate with FieldWise, Anchor advised that it would only accept orders from Tegra, its client. FieldWise believed that Anchor and Tegra were commandeering the equipment to misappropriate its trade secrets. On February 26, 2019, FieldWise filed this complaint, seeking injunctive relief and making claims for replevin, immediate possession of the equipment, and violation of Indiana and federal trade secret laws.

### B. Subsequent Proceedings[1]

On February 26, 2019, the Court granted FieldWise's request for a temporary restraining order, which extended through March 12, 2019. [DE 4]. The order required Anchor to hold the equipment in Gdansk for inspection, required both defendants to produce documents relating to the equipment and its transportation, and prevented any defendant from disclosing information about the equipment to any other entity. [DE 8]. On February 27, Anchor advised FieldWise that the container was currently "on hold by customs in Poland and no one can touch it," but discussed

---

[1] Although the Court's summary of the complaint contains the facts contended by FieldWise, the description of subsequent events is informed by the contentions of all parties.

plans to coordinate the inspection in Gdansk once it was released. Ex. F to Mot. to Dismiss [DE 54-6] at 73-74.

On March 1, 2019, Polish customs officers searched the shipping container. FieldWise interprets Polish customs records as showing that only part of FieldWise's equipment (an "End Tower Unit") was found in the container. *See* [DE 29-7] (Polish Customs Receipt). On March 4, FieldWise requested to have the container searched in a bonded warehouse in Gdansk as ordered, but Tegra described this as "not possible, simply for logistical reasons." Ex. I to Contempt Motion [DE 60-10]. Tegra suggested inspecting the container at its final destination in Ukraine, but FieldWise rejected the proposal. With the dispute ongoing and the temporary restraining order set to expire, FieldWise moved to extend it. All parties consented to the extension[2], and the Court granted the motion, extending the order until April 11. *See* [DE 10, 11].

Eventually, the container was released on March 8, 2019, for delivery to Ukraine, over FieldWise's objection. Anchor and Tegra disagreed about who was responsible for this decision. Anchor told FieldWise that its role in the shipment had ended and that Tegra was responsible for completing the shipment from Gdansk to Ukraine. Tegra indicated that "Polish customs coordinate[d] with a previously determined shipping company" to complete the shipment to Ukraine, a process that was "moving forward without Tegra's involvement." Ex. C to Notice of Violation [DE 12-3] at 3. FieldWise stated that they considered both defendants to be in violation of the temporary restraining order.

By March 11, the shipping container was nine kilometers outside of the Ukranian border, awaiting processing by Ukranian customs. *See* Ex. D to Notice of Violation [DE 12-4]. Fieldwise

---

[2] Although Tegra and Anchor had not yet appeared in this action, FieldWise represented in the motion that "[b]oth Tegra and Anchor . . . consent to this request." [DE 10].

demanded that the container be returned to Gdansk or inspected at a bonded warehouse in Ukraine.

Tegra refused, and Tegra's counsel provided the following rationale:

> My client has also told me that it is not a good idea to attempt to use a bonded warehouse outside of Ukraine customs in the Ukraine. Any diversion from the stated, original plan from shipment will attract the attention of Ukraine customs and could lead to corrupt activities either within customs or the bonded warehouse. Additionally, regarding the return of the truck and container to Gdansk, this process could take weeks to complete. Because of where the truck is now (stuck in a line waiting to go through customs), it must go through customs and enter Ukraine. Once in Ukraine, new transit papers and customs documents would need to be requested to get the container back [. . .] into Gdansk. According to my client, this process could take weeks [. . .] and the container would need to be stored somewhere in Ukraine for that time.

*Id.* Tegra repeated its previous proposal for the container to be inspected on Tegra's property in Ukraine. "[R]eserving all rights" to seek relief for violations of the TRO, FieldWise eventually agreed. On March 15, the container was inspected in the village of Kucheryavovolodymirivka, with a FieldWise surveyor present. All of FieldWise's equipment was inside, but the identification number on the shipping container did not match the number of the container that had been released from Gdansk seven days before. *See* [DE 29-8], [DE 29-9].

Tegra eventually returned the equipment to FieldWise. When FieldWise received the return shipment, on April 15, it found that the equipment had been damaged. Several "anti-tampering" stickers had apparently been removed from the unit, suggesting to FieldWise that the equipment had been dissembled or examined to learn how the technology worked. *See* [DE 60] at 21-22.

FieldWise now seeks to have Tegra and Anchor held in contempt for violating the temporary restraining order. Anchor has moved to dismiss FieldWise's claims, arguing that it has not pled facts stating a claim against Anchor, and the return of the equipment to FieldWise means there is no remaining case or controversy with Anchor. Anchor also seeks attorney's fees under Indiana and federal trade secret law, arguing that FieldWise's trade secret claims against it were made in bad faith.

4

## ANALYSIS

### 1. Anchor's Motion to Dismiss [DE 53]

Anchor moves to dismiss the claims against it, arguing that FieldWise has failed to state any claim for violation of trade secret law, and that the remaining claims against it are moot. Five counts are pled against Anchor: for injunctive relief, requiring Anchor to produce certain documents and not to disclose information to third parties (Count I); replevin (Count II); immediate possession of the equipment pursuant to Indiana Code § 32-35-2-2 (Count III); misappropriation of trade secrets under Indiana law (Count IV); and violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 (Count V).

On a motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim, the Court accepts as true all well-pleaded facts alleged by the plaintiff and all reasonable inferences that can be drawn therefrom. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007); see also *Tamayo v. Blagojevich*, 526 F.3d 1074, 1082 (7th Cir. 2008). Federal Rule of Civil Procedure Rule 8(a)(2) provides that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." However, "recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 661, 678 (2009) (citing *Twombly*, 550 U.S. at 555). A complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570).

If a case becomes moot, the Court no longer has subject matter jurisdiction, and the case must be dismissed. *Pakovich v. Verizon Ltd. Plan*, 653 F.3d 488, 492 (7th Cir. 2011). A claim is moot when there is no relief the Court could grant the prevailing party. *Chafin v. Chafin*, 568 U.S. 165, 172 (2013). In assessing jurisdiction, the Court can make factual findings, rather than relying

only on the allegations in the complaint. *Chi. Joe's Tea Room, LLC v. Vill. of Broadview*, 894 F.3d 807, 814 (7th Cir. 2018).

Anchor first argues that Counts I through III are moot because the equipment has been returned, and Anchor has produced all the documents required by the temporary restraining order. In response, FieldWise does not deny that the equipment has been returned. However, FieldWise argues that the complaint also seeks permanent injunctive relief prohibiting Anchor from using any of FieldWise's proprietary information, so its claims are not yet moot. FieldWise also disputes that Anchor has produced all documents required by the temporary restraining order.

Based on the evidence presented in briefing, the Court is unable to discern whether Anchor's document production satisfied the temporary restraining order. In addition, the Court agrees that the permanent injunction is potential relief that could be granted to FieldWise, which means that Count I – seeking injunctive relief related to the proprietary information – is not moot. However, FieldWise presents no evidence or argument that Anchor (or Tegra) remains in possession of its equipment.[3] There is no issue for the Court to resolve as to replevin (Counts II and III[4]) if FieldWise has recovered the equipment. *See Autocephalous Greek-Orthodox Church of Cyprus v. Goldberg & Feldman Fine Arts, Inc.*, 917 F.2d 278, 290 (7th Cir. 1990). Therefore, Counts II and III are moot and must be dismissed in their entirety for lack of subject matter jurisdiction.

---

[3] While FieldWise asserts that the equipment has been damaged and tampered with, and argues that the defendants should produce additional packaging and documentation, it concedes that the equipment itself has been returned. *See* [DE 60] at 21-22.

[4] Although pled separately as a "claim for immediate possession," Count III is a claim under Indiana's replevin statute. FieldWise would still have to show that someone else has possession of the property, *see Sperro LLC v. Ford Motor Credit Co. LLC*, 64 N.E.3d 235, 244 (Ind. Ct. App. 2016), so Count III is moot.

Next, the Court considers Counts IV and V, the trade secret claims. Anchor moves to dismiss these counts for failure to state a claim. To state a claim under the Indiana Uniform Trade Secrets Act, as pled in Count IV, FieldWise must show that Anchor "misappropriated" a trade secret – essentially, that it acquired or disclosed a trade secret without consent, knowing or having reason to know the secret had been improperly acquired. Ind. Code § 24-2-3-2. The same standard applies to the federal Defend Trade Secrets Act, which is the basis for Count V. *See* 18 U.S.C. § 1839(5)(A)–(B); *Howmedica Osteonics Corp. v. DJO Glob., Inc.,* 2018 WL 3130969, at *7 (S.D. Ind. Mar. 15, 2018) (discussing the identical standards). Therefore, to sustain Counts IV and V, FieldWise must allege facts showing that Anchor used improper means to get FieldWise's trade secrets, or distributed the trade secrets to others knowing that they were secret.

The complaint does not allege facts showing misappropriation by Anchor as defined in the statutes. Specifically, the complaint alleges that Tegra engaged Anchor to "ship products . . . to one of Tegra's subsidiaries" in Ukraine (Compl. ¶ 44); that Anchor was in control of the equipment during its journey from the United States to Gdansk, Poland, including several days while the equipment was waiting in Gdansk (*Id.*, ¶¶ 48-50, 63-64); that Anchor, after initially agreeing to send the equipment back to United States, later told FieldWise it would only accept orders from Tegra, its client (*Id.*, ¶¶ 63-66); that "Defendants threaten to disclose FieldWise's trade secrets" without consent (*Id.*, ¶ 126); that "Defendants threaten to misappropriate FieldWise's trade secrets" (*Id.*, ¶ 129); and that "Anchor knows that the trade secrets were derived from Tegra, who used improper means" to acquire them. (*Id.*, ¶ 130).

Although Anchor allegedly "knows" the trade secrets were acquired improperly, there is no allegation that Anchor knew this when they received the equipment, nor is that inference reasonably supported by the complaint. The facts as pled suggest that Anchor became aware of the

dispute when FieldWise reached out to them directly, when the equipment was already in Gdansk. And while FieldWise obtained an order preventing Anchor from distributing proprietary information to third parties, the complaint does not allege that Anchor has done so – only that it could do so. In short, there are no facts showing that Anchor was anything other than a shipping company moving a container from one place to another at a client's request. What remains are FieldWise's statements that "Defendants threaten to disclose FieldWise's trade secrets" and "Defendants threaten to misappropriate FieldWise's trade secrets." To the extent directed at Anchor, these conclusory allegations are insufficient to state a claim. *Iqbal*, 556 U.S. at 678. Counts IV and V will be dismissed as to Anchor.

### 2. Anchor's Motion for Fees [DE 57]

Anchor seeks an award of attorney fees for the dismissal of Counts IV and V, arguing that FieldWise made these allegations in bad faith. Both the Indiana and federal trade secret statutes permit courts to award reasonable attorney fees to the prevailing party after a bad faith claim of misappropriation. Ind. Code § 24-2-3-5; 18 U.S.C. § 1836(b)(3)(D). A misappropriation claim is made in bad faith if "statements in the pleadings were untrue and [. . .] made without reasonable cause, in light of circumstances existing at the time of the filing." *Loparex, LLC v. MPI Release, LLC*, No. 1:09-cv-01411-JMS-TAB, 2012 WL 3065428, at *4 (S.D. Ind. July 27, 2012) (applying Illinois trade secret law); *see also C.H. v. A.R.*, 72 N.E.3d 996, 1004 (Ind. Ct. App. 2017) ("Bad faith is demonstrated where the party presenting the claim is affirmatively operating with furtive design or ill will.").

Although the claims are dismissed, the Court finds that a fee award would not be appropriate. Anchor has not shown that the pleadings were untrue, only that the allegations were not sufficient to sustain a legal claim. It appears that FieldWise filed this lawsuit to try to protect

intellectual property that had fallen into unknown hands, rather than out of some obvious "furtive design or ill will." Accordingly, the Court denies the request for attorney fees.

### 3. FieldWise's Contempt Motion [DE 59]

FieldWise seeks to have Tegra and Anchor sanctioned and found in contempt of court for violating the temporary restraining order. To succeed on a motion for a finding of contempt, FieldWise must show that

> (1) a court order sets forth an unambiguous command; (2) the alleged contemnor violated that command; (3) the violation was significant, meaning the alleged contemnor did not substantially comply with the order; and (4) the alleged contemnor failed to make a reasonable and diligent effort to comply.

*S.E.C. v. Hyatt*, 621 F.3d 687, 692 (7th Cir. 2010). Courts have broad discretion in fashioning remedies for contempt, including fines or an award of attorney fees to the movant. *F.T.C. v. Trudeau*, 579 F.3d 754, 772 (7th Cir. 2009) (citing *Connolly v. J.T. Ventures*, 851 F.2d 930, 933 (7th Cir. 1988)); *Tranzact Techs., Inc. v. 1Source Worldsite*, 406 F.3d 851, 856 (7th Cir. 2005). Because FieldWise's motion concerns an alleged violation of a previous order, its request is for "remedial" sanctions, meaning the purpose of the sanction would be to compensate FieldWise for losses sustained because of Defendants' disobedience. *See United States v. Dowell*, 257 F.3d 694, 699 (7th Cir. 2001).

FieldWise argues that Anchor and Tegra violated the order by allowing FieldWise's equipment to be moved from Gdansk to Ukraine. On that issue, the Court ordered as follows:

> 5. Anchor shall hold Container No. MSKU4774016 in a bonded warehouse at Gdansk, Poland;
>
> 6. Anchor shall cease any efforts to arrange the inland transportation of the container to Ukraine until the issue of title of the Equipment is resolved.

[DE 8]. The Court considers the conduct of each defendant in turn.

### a. Anchor[5]

On February 26, 2019, when the Court's order went into force, the container with FieldWise's equipment had already arrived in Gdansk, and was being held by Polish customs. Anchor's bill of lading for the container indicated that Anchor would ship the container from Baltimore to Gdansk, with Tegra as the exporter and "Imperial Agro Ltd," a Tegra subsidiary, as the consignee. *See* [DE 54-6] at 59; [DE 60-7] at 6. Anchor asserts that when the container arrived in Gdansk on February 18, 2019, it became Imperial Agro's responsibility, and Anchor had no further right to move the container. Tegra's counsel confirmed on March 8, 2019 that "[o]nce delivered [to Poland], Anchor's control of the container ended." Ex. C to Notice of Violation [DE 12-3] at 2-3.

On February 27, Anchor, receiving "permission" from a Tegra representative, had preliminary discussions with FieldWise to send the equipment back to the U.S. once it cleared customs. [DE 54-6] at 73-75. Anchor then contacted Romex Cargo Service ("Romex"), the company retained by Tegra to take the container from Poland to Ukraine, to inquire about the possibility of retrieving the equipment from the shipping container. *Id.* at 104-105. Romex's representative advised that "[w]e can not touch this container until [Polish] customs receives release/disposition from US Customs." *Id.* When the container was released from customs on March 8 and sent toward Ukraine, Anchor's representative offered to help FieldWise "in every possible way I can," but reiterated its position: "[W]e as carrier have delivered this container to [Gdansk], this is all we have been hired for. Container was seized by CUSTOMS and released to Tegra Agent in [Gdansk]. This is in hands of [Tegra] not in my custody." [DE 12-3] at 3.

---

[5] Anchor seeks leave to file a sur-reply against FieldWise's motion, to address arguments raised in the reply about the admissibility of evidence in Anchor's response. [DE 74]. To permit Anchor to respond to these arguments, the Court will grant the motion and consider the sur-reply.

On this evidence, FieldWise has not shown that Anchor was in contempt of the Court's order. The Court ordered Anchor to "hold" the container in Gdansk, based in part on FieldWise's stated belief that Anchor was in control of the container (*see* [DE 8], ¶ 32). However, the evidence presented – including the bill of lading and written correspondence of both defendants – indicates that Tegra, not Anchor, controlled the container. Although Anchor (at Tegra's direction) eventually refused to take instructions from FieldWise, this did not demonstrate contempt for the Court's order, because no directive from FieldWise would have given Anchor the authority to ensure the container would be held in Gdansk. At minimum, Anchor made "a reasonable and diligent effort to comply" by offering to coordinate a return shipment when Tegra permitted it to do so. *Hyatt*, 621 F.3d at 692. Therefore, a finding of contempt against Anchor is not appropriate.

**b. Tegra**

The Court now considers whether Tegra was in contempt of the Court's order. For the reasons described above, the Court finds that Tegra – through its subsidiary, Imperial Agro – assumed responsibility for the container when it arrived in Gdansk on February 19, 2019. From February 19 until March 8, the container was detained by Polish customs, and FieldWise presents no evidence that Tegra could have moved the container to a bonded warehouse during that period.

The situation changed on March 8, 2019, when the container was released from Polish customs and sent to Ukraine, per Tegra's instructions. Once released from customs, Tegra was in control of the container and could have stopped the shipment. When FieldWise demanded that the shipment to Ukraine be stopped, Tegra's counsel gave an evasive response, reading in part:

> Tegra is not transporting the container from Polish customs to anywhere else and never was. Per the initial shipping plans that Tegra initiated weeks ago to ship its products to Ukraine, Polish customs coordinates with a previously determined shipping company to get the container out of Poland to its ultimate destination in the Ukraine. This process is moving forward without Tegra's involvement. To the

best of my client's understanding, Polish Customs and the local shipping company are proceeding with the plans that were already set in motion weeks ago.

[DE 12-3] (e-mail sent March 8, 2019). It may be technically true that the container was transported "[p]er [Tegra's] shipping plans" and yet "without Tegra's involvement." But that misses the crucial point – whether Tegra could have stopped the shipment to comply with the Court's order. Tegra offers no evidence that it could not have done so, or that it even tried.[6] On March 11, Tegra's counsel denied FieldWise's renewed request to divert the container to a bonded warehouse, on the basis that "[a]ny diversion from the stated, original plan from shipment will attract the attention of Ukraine customs and could lead to corrupt activities either within customs or the bonded warehouse." [DE 12-4]. In short, Tegra could have diverted[7] the shipment, but declined to do so, based on vague assertions of potential "corrupt activities." If there were legitimate concerns about deviating from the original shipping plan, Tegra could have brought those to the Court's attention when FieldWise sought to extend the temporary restraining order on March 6.[8] Instead, Tegra agreed to extend the order, and carried on shipping to Ukraine anyway.

Tegra argues that it did not violate the Court's order because the order specifically instructed Anchor, not Tegra, to hold the shipment. *See* [DE 8]. However, Tegra "need not be expressly named in the [order] to be held liable for civil contempt." *Quinter v. Volkswagen of Am.*, 676 F.2d 969, 972 (3d Cir. 1982); *see also Bailey v. Roob*, 567 F.3d 930, 935 (7th Cir. 2009) (a

---

[6] Although Tegra states it "contacted its . . . shipping partners to determine if it was even possible to stop the shipment," [DE 68] at 7, there is no evidence that Tegra was ever told it was not "possible."

[7] In the same e-mail, Tegra's counsel stated that because the truck was in the Ukranian customs line at that time of writing, "it must go through Ukraine customs and enter Ukraine." [DE 12-4]. Even if this were true, it does not explain Tegra's failure to stop the shipment before it reached Ukranian customs.

[8] In another e-mail, Tegra's counsel suggested that there were logistical issues involved with searching the container in a bonded warehouse. *See* [DE 60-10]. Tegra does not make that argument in its response to the contempt motion. Even if it had, "[t]he proper procedure for any party seeking to act in contravention to an injunction order, despite a prior agreement, is to file a motion to amend the injunction." *Select Med. Corp. v. Cash Flow Consultants, Inc.*, No. 09 C 8066, 2010 WL 2891639, at *1 (N.D. Ill. July 20, 2010).

party can be in found in contempt if it "has not been reasonably diligent and energetic in attempting to accomplish what was ordered") (quoting *Goluba v. School Dist. of Ripon*, 45 F.3d 1035 (7th Cir.1995)). Although more typically applied to non-parties found in contempt, the same reasoning applies here. The Court ordered that the equipment be held in Gdansk, based on preliminary factual findings that FieldWise could have difficulty tracking the equipment if it was shipped to Ukraine. *See* [DE 8], ¶¶ 56-59. The order referenced Anchor based partly on FieldWise's stated belief that Anchor was controlling the shipment, and the fact that Anchor had offered to arrange the return of the equipment to FieldWise. *Id*., ¶¶ 32, 47-48. Ultimately, the Court issued an "unambiguous command" that the shipment be held in Gdansk, and Tegra willfully violated that command. *Hyatt*, 621 F.3d at 692. Tegra does not dispute that it knew about the order, or that Anchor, the party named in the order, was acting as Tegra's agent for purposes of shipment.[9] *Quinter*, 676 F.2d at 973 ("All that is required is that a person "have actual knowledge of the order and ... 'either abet the defendant or ... be legally identified with him.'") (quoting *Thompson v. Johnson*, 410 F.Supp. 633 (E.D. Pa. 1976)). Under these circumstances, the Court finds Tegra in contempt of the Court's order.

FieldWise requests an award of all the attorney fees it has incurred since March 8, 2019. That request is too broad, because not all of FieldWise's fees are attributable to Tegra's violation of the order. *See Dowell*, 257 F.3d at 699 (remedial sanctions are intended to compensate for losses sustained because of the violation). Instead, FieldWise may only collect fees it incurred as a direct result of the wrongful shipment to Ukraine. In other words, FieldWise can collect attorney fees incurred on or after March 8, 2019, in attempting to stop the shipment to Ukraine; any additional

---

[9] The Court notes that Tegra itself muddled the issue by claiming that Romex, the carrier from Poland to Ukraine, had "coordinated with" Anchor to ship to Ukraine, even as it acknowledged that "Anchor's control of the container ended" when it arrived in Poland. *See* Tegra's Responses to Interrogatories [DE 60-7] at 5; [DE 12-3] at 2-3.

fees incurred to arrange the inspection in Ukraine, rather than in Poland; and the fees incurred in briefing the contempt motion.

## CONCLUSION

For the foregoing reasons, the Court:

(1) **GRANTS in part** Anchor's Motion to Dismiss [DE 53]. Counts II and III are **DISMISSED** in their entirety. Counts IV and VI are **DISMISSED** as to Anchor only. Count I remains pending as to both defendants;

(2) **DENIES** Anchor's motion for attorney fees [DE 57];

(3) **GRANTS** Anchor's motion to file a sur-reply [DE 74] and **ACCEPTS** the sur-reply [DE 74-1] as properly filed;

(4) **GRANTS in part** FieldWise's motion for sanctions [DE 59], and **FINDS** Defendant Tegra in contempt of court for its failure to follow the temporary restraining order. FieldWise is **ORDERED** to file, on or before **March 12, 2021**, an itemization of fees incurred as a result of Tegra's failure to hold the shipping container in Gdansk. Tegra may file a response to the itemization by **April 2, 2021**.

SO ORDERED on February 12, 2021.

s/ Joseph S. Van Bokkelen
JOSEPH S. VAN BOKKELEN, JUDGE
UNITED STATES DISTRICT COURT

14